KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
LAWRENCE Y. ISER (SBN 094611)
  liser@kwikalaw.com
GREGORY P. KORN (SBN 205306)
  gkorn@kwikalaw.com
GREGORY S. GABRIEL (SBN 239902)
  ggabriel@kwikalaw.com
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Telephone:   310.566.9800
Facsimile:   310.566.9850

Attorneys for
SeaWorld Entertainment, Inc.;
SeaWorld Parks & Entertainment, Inc.;
SeaWorld Parks & Entertainment LLC
and SeaWorld LLC

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SPIRALEDGE, INC.,<br><br>            Plaintiff,<br><br>    vs.<br><br>SEAWORLD ENTERTAINMENT, INC.; SEAWORLD PARKS & ENTERTAINMENT, INC.; SEAWORLD PARKS & ENTERTAINMENT LLC, SEAWORLD LLC; and DOES 1-10, inclusive,<br><br>            Defendants.<br><br>SEAWORLD PARKS & ENTERTAINMENT, INC.; SEAWORLD PARKS & ENTERTAINMENT LLC, SEA WORLD LLC;<br><br>            Cross-Complainants,<br><br>    vs.<br><br>SPIRALEDGE, INC.,<br><br>            Cross-Defendant. | Case No. 13:CV0296-BAS-BLM<br><br>**REDACTED DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION OF DAMAGES**<br><br>[Notice of Motion and Declaration of Gregory Korn Filed Contemporaneously Herewith]<br><br>Date:    August 11, 2014<br>Time:    10:30 am<br>Crtrm.: 4B<br><br>NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT |

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................. 1

II.   FACTUAL BACKGROUND ................................................ 3

   A.    Spiraledge And Its "Aquatica" Brand ................................ 3

   B.    Spiraledge's AQUATICA Registration ............................. 4

   C.    SeaWorld's Good Faith Use Of The "Aquatica" Name ...... 4

     1.    SeaWorld Selected The Name "Aquatica" Without Knowledge Of, And For Reasons Unrelated To, Spiraledge ...... 4

     2.    SeaWorld Adopted The "Aquatica" Name In Reliance Upon The Advice Of Counsel ...... 5

     3.    SeaWorld Has Never Sought To Confuse Consumers ...... 6

III.  THE DISGORGEMENT CLAIM FAILS AS A MATTER OF LAW ...... 7

   A.    Spiraledge Seeks To Disgorge Profits Under A Theory Of "Unjust Enrichment" ...... 7

   B.    Profits May Be Disgorged Only Where The Defendant Willfully Capitalizes On The Goodwill Of An Established Mark ...... 8

   C.    Inglish's Disgorgement Opinion Contravenes Ninth Circuit Law ...... 10

   D.    "Willfulness" Is Not Redefined For Reverse Confusion Cases ...... 13

   E.    Disgorgement Would Provide Spiraledge An Improper Windfall ...... 16

IV.   SPIRALEDGE'S CORRECTIVE ADVERTISING CLAIM FAILS AS A MATTER OF LAW ...... 20

V.    CONCLUSION ...... 25

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY ADJUDICATION OF DAMAGES

1

## TABLE OF AUTHORITIES

2                                                                          **Page**

3

## FEDERAL CASES

4

*Adray v. Adry-Mart, Inc.*
76 F.3d 984 (9th Cir. 1995)..................................................................passim

*Bihari v. Gross*,
119 F. Supp. 2d 309 (S.D.N.Y. 2000)..........................................................22

*Blau v. YMI Jeanswear, Inc.*
2004 WL 5313967 *5 (C.D. Cal.) ................................................................8

*Lindy Pen Co. v. Bic Pen Corp.*
982 F.2d 1400 (9th Cir. 1993)...........................................................passim

*Maier Brewing Co. v. Fleischmann Distilling Corp.*
390 F.2d 117 (9th Cir. 1968)..............................................................passim

*Playboy Enterprises, Inc. v. Baccarat Clothing Co.*
692 F.2d 1272 (9th Cir. 1982).............................................................9, 10

*Quia Corp. v. Mattel, Inc.*
2011 WL 2749576 at *5 (N.D. Cal. 2011)..............................................20, 21

*S. Cone, Inc. v. Timex Corp.*
2002 WL 34450329 *1 (S.D. Cal., 2002) ...................................................20

*S. Snow Mfg. Co. v. Sno Wizard Holdings, Inc.*,
829 F. Supp. 2d 431 (E.D. La. 2011) ..................................................21, 23

*Spin Master, Ltd. v. Zobmondo Entertainment, LLC*
944 F.Supp.2d 830  (C.D. Cal. 2012)................................................8, 14, 15

*Surfvivor Media, Inc. v. Survivor Prods*.
406 F.3d 625 (9th Cir. 2005)...................................................................13

*Taylor Made Golf Co. v. Carsten Sports, Ltd.*,
175 F.R.D. 658 (S.D. Cal. 1997).................................................................9

*Toyota Motor Sales v. Tabari*
610 F.3d 1171 (9th Cir.2010)...................................................................22

*Trafficschool.com, Inc. v. Edriver Inc.*,
653 F.3d 820 (9th Cir. 2011)......................................................................9

*Trovan, Ltd. v. Pfizer, Inc.*
2000 WL 709149 *14 (C.D. Cal. May 24, 2000) .........................................16

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY ADJUDICATION OF
DAMAGES

**FEDERAL STATUTES**

15 U.S.C. § 1117(a) .......................................................................2, 8, 10, 15

**OTHER AUTHORITIES**

J. Thomas McCarthy, 5 *McCarthy on Trademark* § 30:84 (5th ed. 1999)..........19, 20

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY ADJUDICATION OF DAMAGES

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

In order to avoid punitive awards that confer a windfall upon plaintiffs, the Ninth Circuit strictly limits the of disgorgement of an accused infringer's profits in trademark cases.  Infringement must not only be "willful" to justify an accounting of profits.  Such an award is permissible "only in those cases where the infringement is 'willfully calculated to exploit the advantage of an established mark.'"  *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1405 (9th Cir. 1993).

Plaintiff Spiraledge, Inc. ("Spiraledge"), owner of a registered trademark for AQUATICA, alleges that the SeaWorld Defendants are infringing that mark in operating three "Aquatica SeaWorld's Waterpark" amusement parks in Orlando, San Antonio, and San Diego.  It seeks to disgorge millions of dollars in SeaWorld's profits pursuant to an unjust enrichment theory, which it proffers through damages expert Blake Inglish.  But in an unusual twist, Spiraledge's own expert admits that he is familiar with *Lindy Pen* and similar decisions, he admits that SeaWorld's use of the AQUATICA mark "didn't have anything to do with Spiraledge's goodwill as far as I can see," and he admits that disgorgement cannot be awarded if this Court follows Ninth Circuit law, as it must:

> [T]o the extent that the court does find that there is a requirement to prove an intent to use the plaintiff's goodwill to recover on unjust enrichment, my opinion would be that there would be no unjust enrichment damages in this case obviously . . . .

See infra p. 11.

Inglish nevertheless proffered a disgorgement theory because he was instructed by counsel that this Court will make an exception to *Lindy Pen* and its progeny for so-called "reverse confusion" cases, where the accused infringer is typically larger and more successful than that plaintiff and unlikely to be motivated by a desire to capitalize on the plaintiff's goodwill.  To the contrary, *Lindy Pen* is a

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY ADJUDICATION OF DAMAGES

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   reverse confusion case.  It was specifically in the context of a larger and more

2   successful defendant, who was unlikely to want to capitalize on the plaintiff's

3   negligible brand recognition, that the *Lindy Pen* Court reaffirmed the Ninth Circuit

4   rule that disgorgement awards are not permissible absent a showing of intent to

5   trade off of the trademark owner's goodwill.  That opinion and a recent, directly on-

6   point opinion from the Central District of California explain that even in the reverse

7   confusion context, intentional trading off the plaintiff's goodwill is a prerequisite to

8   ensure that an accounting of profits is compensatory rather than punitive in nature,

9   and does not gift the plaintiff a windfall.  *See* 15 U.S.C. § 1117(a) (requiring that

10  disgorgement awards "shall constitute compensation and not a penalty"); *Lindy Pen*,

11  982 F.2d at 1405 (holding that a profits award would provide the plaintiff a windfall

12  where the defendant's "major position in the industry makes it clear that it was not

13  trading on [plaintiff's] relatively obscure name").

14         Here as in *Lindy Pen*, the disgorgement of millions in profits earned by

15  SeaWorld from its amusement parks would be punitive and provide Spiraledge an

16  unwarranted windfall.  SeaWorld selected the "Aquatica" name years before

17  Spiraledge began using the mark in commerce.  It selected the name, as Spiraledge's

18  expert describes, because of the "intrinsic" qualities that made it appealing for a

19  waterpark, not for any reasons relating to Spiraledge.  SeaWorld has never sought to

20  capitalize on Spiraledge's "relatively obscure" brand of Aquatica swimwear and

21  accessories, which was launched <u>after</u> the first Aquatica waterpark opened.  And

22  SeaWorld's enormous revenues are not attributable in the least to any brand

23  recognition that Spiraledge has developed.

24         Spiraledge's disgorgement claim fails as a matter of law and should be

25  summarily adjudicated.  So too should its second and last claim for monetary relief,

26  which seeks "corrective advertising" costs.  Spiraledge proffers that claim through a

27  purported expert in optimizing websites who ignores the prerequisites for a

28  corrective advertising award.  Spiraledge's expert failed to analyze whether the

AQUATICA mark has suffered a "loss in value," as Ninth Circuit case law requires. Just as other district courts have held in the past, Spiraledge's failure to perform this analysis precludes its corrective advertising theory as a matter of law.

For the reasons discussed further below, SeaWorld respectfully requests that the Court grant summary adjudication in its favor on all claims for monetary relief.

## II.    FACTUAL BACKGROUND

### A.    Spiraledge And Its "Aquatica" Brand

Spiraledge has owned and operated several online retail stores since 2001. FAC ¶ 9.  Its flagship site, swimoutlet.com, sells major name brand swimwear and is "one of the largest online retail shops selling swimwear and swim accessories in the United States"  according to the company's principal and founder, Avi Benaroya.  *See* Exh. 12 at 4.[1]  Spiraledge's damages expert, Blake Inglish, calculates that the company's total annual revenues ███████████████████████ ██████████████████████████████████████    Exh. 12 at 5.

On February 8, 2005, Spiraledge filed an intent to use ("ITU") application with the USPTO to register AQUATICA for use in Class 35 in connection with online sales of swimwear, apparel, and accessories, as well as an online directory of places to swim.  First Amended Complaint ("FAC") ¶ 10.  Spiraledge owned the domain name aquatica.com at the time, but the site was just a landing page with a "Coming Soon" banner and links to swimoutlet.com and two other Spiraledge websites.   Exh. 7 (Linda Smith Depo. at 50:6-52:10); Exh. 14.

In September 2008, while its ITU application was still pending, Spiraledge's aquatica.com site went live.  FAC ¶ 13.  The site offers "Aquatica" branded swimwear, an Aquatica T-shirt and hat, and swim accessories like goggles, towels, and kick boards.  FAC ¶ 14; Exh. 28.  The Aquatica products are sold retail on Spiraledge's swimoutlet.com site.  FAC ¶ 14.  In addition to these retail sales,

---

[1] All exhibit citations are to the Declaration of Gregory Korn.  For the Court's convenience, relevant portions of exhibits are highlighted or boxed.

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY ADJUDICATION OF DAMAGES

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   Spiraledge sells its Aquatica products wholesale.



12   **B.    Spiraledge's AQUATICA Registration**

13   The USPTO initially "allowed" Spiraledge's ITU application, but then

14   refused the application on the basis of a likelihood of confusion with a prior

15   registration owned by third-party Invader Internacional ("Invader") for use of the

16   mark ACUATICA on clothing.  Exh. 15.  Spiraledge filed a lawsuit against Invader

17   through which it procured a co-existence agreement stipulating that its use of

18   AQUATICA for online sales of swimwear and apparel would not be confused with

19   Invader's "Acuatica" swimwear and apparel.  Exh. 16.  The USPTO accepted the

20   coexistence agreement at face value and issued Spiraledge a registration on

21   December 27, 2011.  FAC ¶ 12.

22   **C.    SeaWorld's Good Faith Use Of The "Aquatica" Name**

23           1.    <u>SeaWorld Selected The Name "Aquatica" Without Knowledge</u>

24                 <u>Of, And For Reasons Unrelated To, Spiraledge</u>

25   In 2005, after making the decision to develop a new waterpark for the

26   Orlando area, SeaWorld began testing names using an outside marketing agency and

27   focus groups.  Exh. 7 (Smith Depo. at 21:18-22:5, 116:20-117:9).  "Aquatica" was

28   among several names that SeaWorld's marketing agency proposed, and it tested

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY ADJUDICATION OF DAMAGES

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  strongly.  *Id.* at 119:7-13.  Focus groups commented 

5  Exh. 23.

6  Respondents obviously did not mention Spiraledge's Aquatica brand or

7  website as a reason for the name's appeal.  The testing occurred more than three

8  years before Spiraledge began using the mark in commerce.

9  2.  SeaWorld Adopted The "Aquatica" Name In Reliance Upon The

10  Advice Of Counsel

11  The name "Aquatica" was provided to in-house attorney Baldev Sarai, an

12  experienced trademark lawyer, for clearance.  Exh. 24.  His preliminary research did

13  not rule out "Aquatica," *id.*, and so he enlisted SeaWorld's outside trademark

14  counsel, Ed Wierzbicki of Loeb & Loeb, to conduct a full trademark search.

15  Wierzbicki performed the search and provided his initial opinions in an August 25,

16  2005 letter.  Exh. 25.

17  Wierzbicki's August 2005 letter identified several other uses of "Aquatica,"

18  including a few waterparks in Europe.  The letter also identified Spiraledge's ITU

19  for AQUATICA but opined

20  .  *Id.*

21  Based on Wierzbicki's opinion, SeaWorld filed its own ITU application to

22  register AQUATICA for amusement park services in September 2005.  FAC ¶ 30.

23  The USPTO suspended SeaWorld's application in March 2006 pending Spiraledge's

24  application.  *Id.*  SeaWorld promptly sought further advice from its counsel.  An

25  April 17, 2006 opinion from Wierzbicki

28  Exh. 26.

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY ADJUDICATION OF DAMAGES

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 █████████████.  *Id.*  Based on the opinions received from in-house and outside

4 trademark counsel, SeaWorld internally announced the selection of the name

5 "Aquatica" in June 2006.  Exh. 23.

6     A further opinion of counsel was provided in February 2008.  Exh. 27.

7 Wierzbicki again opined ████████████████████████████████████████

8 ████████████████████████████████████████████████████████.

9 *Id.*  Relying on the consistent advice from its counsel between 2005 and 2008,

10 SeaWorld moved forward and opened its first "Aquatica SeaWorld's Waterpark" in

11 Orlando in March 2008.  Dkt. No. 34, Atch., 2 (Brown Decl., ¶ 3).

12     In May 2012, simultaneous with the opening of a second Aquatica waterpark

13 in San Antonio, the USPTO refused SeaWorld's ITU application for the use of

14 AQUATICA in connection with amusement park services.  FAC ¶ 37.  Additional

15 refusals of two other related ITU applications by SeaWorld followed.  FAC ¶¶ 38-

16 45.  Although each of the refusals cited the possibility of consumer confusion

17 between Spiraledge's and SeaWorld's potential uses of the AQUATICA mark,

18 FAC ¶¶ 37-45, SeaWorld continued to trust in the opinions of counsel received

19 between 2005 and 2008 that no rational consumer could confuse these two parties'

20 different uses of the AQUATICA mark.  Exh. 10 (Atchison Depo. at 151:6-14).

21 SeaWorld therefore moved forward to open a third Aquatica park in Chula Vista,

22 California.

23          3.    SeaWorld Has Never Sought To Confuse Consumers

24     Not only did SeaWorld identify and adopt the "Aquatica" name before

25 Spiraledge entered the market, and without the intention to trade off of Spiraledge's

26 non-existent goodwill, but it has also taken steps to steer clear of Spiraledge's

27 limited space in the market and to further distinguish the parties' brands.

28 Respecting Spiraledge's registration for online sales, SeaWorld has never sold or

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   marketed any waterpark-related souvenirs online.  Dkt. No. 34, Atch. 1 (Tebbe-

2   Shemelya Decl. ¶ 6).  SeaWorld's Aquatica merchandise is sold exclusively within

3   the three waterparks, the only exceptions being that a limited number of Aquatica

4   items (not including swimwear) have been offered inside the three SeaWorld theme

5   parks and in a SeaWorld company store in the Orlando airport.  *Id.* ¶¶ 4-6.  It is

6   impossible for a prospective Spiraledge consumer to purchase a SeaWorld souvenir

7   by mistake.

8       SeaWorld has also closely associated the Aquatica waterparks with the

9   SeaWorld brand to distinguish the parties.  The SeaWorld brand is used in the parks'

10  full name ("Aquatica SeaWorld's Waterpark"), it is contained in the domain name

11  for the parks' website (aquaticabyseaworld.com), it is used heavily in the

12  aquaticabyseaworld.com website, and it is used in marketing materials.  *See*, *e.g.*,

13  Exh. 29; Exh. 9 (Marshburn Depo. at 152:12-153:25).  Due to these branding

14  efforts, any reasonable consumer who visits Spiraledge's website and pays just an

15  announce of attention would know that the site is unrelated to SeaWorld.  *Contrast*

16  Exhs. 28 and 29.  Similarly, anyone who sees links to both parties' websites when

17  searching on Google will see that the SeaWorld brand is conspicuously absent from

18  the link to Spiraledge's site or accompanying text—a clear indication that

19  aquatica.com is not related to the SeaWorld waterparks.  *See*, *e.g.*, Exh. 30.[2]

20  **III.   THE DISGORGEMENT CLAIM FAILS AS A MATTER OF LAW**

21      **A.    Spiraledge Seeks To Disgorge Profits Under A Theory Of "Unjust**

22          **Enrichment"**

23      Spiraledge's damages expert, Blake Inglish, declined to calculate actual

24  damages.  Exh. 12 at 43.  He testified that the types of harms that Spiraledge claims

25  "are very difficult to quantify with any kind of certainty that would be required by

26  _____

27      [2] It is a pet theory of Spiraledge that consumer confusion is likely merely
    because the two parties' websites come up when Google searches are performed for
    "aquatica" or variations like "aquatica swimwear."  In fact, as discussed *infra* (p. 21-

28  22), courts have rejected this exact argument.

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY ADJUDICATION OF DAMAGES

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  the courts and, as such, I didn't feel it was appropriate to put a number out . . . ."

2  Exh. 1 (Inglish Depo. at 82:16-24).  Inglish's only opinion, therefore, concerns the

3  remedy of disgorgement of SeaWorld's profits.  Exh. 12 at 43 *et seq.*

4      In the Ninth Circuit, "a plaintiff may recover an infringing defendant's profits

5  in two situations: (1) as a measure of the plaintiff's own damages; or (2) on a theory

6  of disgorgement of the defendant's unjustly obtained profits."  *Spin Master, Ltd. v.*

7  *Zobmondo Entertainment, LLC*, 944 F.Supp.2d 830, 839 (C.D. Cal. 2012) (citing

8  *Lindy Pen*, 982 F.2d at 1407).  Appropriately, Inglish does not suggest an

9  accounting of SeaWorld's profits as a measure of Spiraledge's damages, also known

10  as a "proxy" approach.  *Id*. at 839-840.  That approach is unavailable here, where

11  SeaWorld's ███████████████████████████ from its waterparks are not a

12  reasonable basis for estimating Spiraledge's lost sales of swimwear (if any).  *See*

13  *Blau v. YMI Jeanswear, Inc.*, 2004 WL 5313967 *5 (C.D. Cal.) (summarily

14  adjudicating proxy claim where parties' products were not proxies).  Inglish instead

15  relies on an unjust enrichment rationale for disgorgement.  Exh. 12 at 56.

16      Inglish was "asked by counsel to make the legal assumption that all of the

17  sales reported for SeaWorld's Aquatica Water Parks are accused of infringement."

18  *Id.* at 44 n.162.  Inglish calculated SeaWorld's revenues during the relevant period

19  ██████████████████████████.  *Id.* at 44.  Inglish does not opine in his initial

20  report or in any other report provided to SeaWorld what portion of that ████████

21  number represents SeaWorld's supposed unjust enrichment.  Exh. 1 (Inglish Depo.

22  at 190:19-191:2).

23      For the reasons discussed below, Inglish's disgorgement theory fails as a

24  matter of law, and the Court need look no further than his own testimony to prove it.

25  **B.    Profits May Be Disgorged Only Where The Defendant Willfully**

26  **Capitalizes On The Goodwill Of An Established Mark**

27      Section 1117 of the Lanham Act authorizes courts to award "defendant's

28  profits" from the infringement of its trademark.  15 U.S.C. § 1117(a).  The Act

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   limits such an accounting of profits in two ways.  First, all monetary awards under

2   the Lanham Act are "subject to the principles of equity."  *Id.*  Second, all monetary

3   awards must "constitute compensation and not a penalty."  *Id.*  The same holds true

4   for an accounting of profits.  "The Lanham Act allows an award of profits only to

5   the extent the award 'shall constitute compensation and not a penalty.'"

6   *Trafficschool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 831 (9th Cir. 2011), quoting

7   15 U.S.C. § 1117(a) ); *Taylor Made Golf Co. v. Carsten Sports, Ltd.*, 175 F.R.D.

8   658, 662 (S.D. Cal. 1997) ("Because awards [for Lanham Act violations] can only

9   compensate actual injuries, they cannot be . . . punitive.").

10          These equitable limitations in the Lanham Act have led to judicially-imposed

11  restrictions on the disgorgement of an accused infringer's profits.  The unequivocal

12  rule in the Ninth Circuit is that disgorgement may be awarded only where the

13  infringement is "willful."[3]  *See Playboy Enterprises, Inc. v. Baccarat Clothing Co.*,

14  692 F.2d 1272, 1274 (9th Cir. 1982); *Maier Brewing Co. v. Fleischmann Distilling*

15  *Corp.*, 390 F.2d 117 (9th Cir. 1968);  *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d

16  1400, 1405-1406 (9th Cir. 1993); *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988 (9th

17  Cir. 1995).

18          Importantly, "willful" has a particular meaning in this context—different than

19  its meaning when analyzing intent to infringe under the *Sleekcraft* test for consumer

20  confusion.  Pursuant to the Ninth Circuit cases cited above, an infringer is "willful"

21  so as to permit an accounting of profits <u>only</u> if it intentionally sought to capitalize on

22  the plaintiff's goodwill.

23          In *Lindy Pen*, the plaintiff (Lindy) and defendant (Bic) were competitors in

24  the manufacture of ball point pens.  982 F.2d at 1403.  In 1965, while Lindy's

25  application to register AUDITORS for use on pens was pending, Bic began using

26  that same mark.  Bic complied with a cease and desist letter from Lindy, and in

27          [3] Willfulness is not required to disgorge profits under a "proxy" theory, but a

28  proxy claim has not and cannot be asserted under the facts of this case.

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1966, Lindy received a registration for the mark. *Id.* But in 1980, Bic again adopted the AUDITORS mark despite knowing of Lindy's registration. *Id.* After a series of decisions and appeals, the district court determined that Bic was liable for trademark infringement. *Id.* at 1404. The district court nevertheless found "that an accounting of profits was inappropriate because Bic's infringement was innocent and accomplished without intent to capitalize on Lindy's trade name." *Id.*

The Ninth Circuit affirmed, reiterating that "an accounting of profits is <u>not automatic</u> and must be granted in light of equitable considerations." *Id.* at 1405 (emphasis added unless otherwise stated). The Court held that something more than injunctive relief is necessary where the infringement is "deliberate and willful," but that "[t]his standard applies, however, <u>only in those cases where the infringement is 'willfully calculated to exploit the advantage of an established mark.</u>'" *Id.* (quoting *Playboy*, 692 F.2d at 1274). The Court agreed with the trial court that Lindy fell short of that standard. *Id.* at 1406-1407. Even though Bic was admittedly aware of Lindy's rights, *id.* at 1405-1406, "[w]illful infringement," the Court noted, "carries a connotation of deliberate intent to deceive." It added: "Indeed, this court has cautioned that an accounting is proper only where the defendant is "attempting to gain the value of an established name of another." *Id.* at 1406 (quoting *Maier Brewing*, 390 F.2d at 123). Citing several factors, including the weakness of Lindy's mark, the Court found that it was "reasonable for the district court to conclude that Bic's actions were not 'willfuly calculated to exploit the advantage of an established mark,' . . . and that Bic's conduct did not rise to the level of willfulness which would have mandated an award." *Id.* at 1406. The Court concluded that "[t]o award profits in this situation would amount to a punishment in violation of the Lanham Act which clearly stipulates that a remedy 'shall constitute compensation and not a penalty.'" *Id.* at 1407 (quoting 15 U.S.C. § 1117(a)).

## C. Inglish's Disgorgement Opinion Contravenes Ninth Circuit Law

No rational trier of fact could find that SeaWorld selected the AQUATICA

mark to capitalize on the "value of an established name" as Ninth Circuit cases require to disgorge profits on an unjust enrichment basis. There was no "established name" when the first Aquatica waterpark opened: Spiraledge did not begin using the AQUATICA mark in commerce until months later. Moreover, the evidence is indisputable that SeaWorld identified and then selected "Aquatica" solely because it tested well with focus groups, not for any reasons related to Spiraledge.

Lindy Pen and its progeny are dispositive of Spiraledge's disgorgement claim, and Spiraledge's own damages expert admits as much. Inglish is aware of Lindy Pen and similar cases, he agrees that his disgorgement theory violates these cases, and he admits that the claim fails if the Court follows Lindy Pen. He testified:

> I understand there are some cases out there that suggest that intent may be a requirement for some damage recoveries such as unjust enrichment . . . . For example, I think there are some courts that have said that the intent may require an intention to use the plaintiff's goodwill to make damages – in order to get a damage recovery.

Exh. 1 (Inglish Depo. at 29:24-30:17). He then acknowledged that no disgorgement can be ordered if the Court follows Lindy Pen:

> [T]o the extent that the court does find that there is a requirement to prove an intent to use the plaintiff's goodwill to recover on unjust enrichment, my opinion would be that there would be no unjust enrichment damages in this case obviously . . . ."

Id. at 32:5-9. Inglish explained that disgorgement would not be warranted under Lindy Pen because "there's not clear evidence that I've seen that I can quantify of benefit from SeaWorld's use of Spiraledge's goodwill." Id. at 194:9-11.

Despite Inglish's astute awareness that a disgorgement claim is unavailable in this case, he nevertheless proffered such a claim because he was "informed by counsel that the fact patterns in this case are distinct enough and different enough to where those types of rulings should not apply for a number of reasons." Id. at 30:9-

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

<div align="left" style="vertical-align:middle">

**KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP**
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

</div>

12.  Based on his counsel's assertion that this Court would not follow *Lindy Pen* and other binding Ninth Circuit cases, Inglish offered the opinion that SeaWorld has been unjustly enriched by benefitting from the "intrinsic value" of the word "aquatica." *Id.* at 194:11-14 (". . . I have seen a number of data points that provide insight into the intrinsic value of the Aquatica mark and how SeaWorld has perceived value in that and how they have benefitted from that."). Inglish explains that "intrinsic value" is the inherent value in the word "aquatica," to be contrasted with the goodwill that the word gained through use in commerce. *Id.* at 106:6-21. Inglish argues that the intrinsic value of "aquatica" is evidenced by SeaWorld's focus group respondents, who liked the name "for reasons that are just intrinsic to the word Aquatica as it pertains to a water park." *Id.* at 200:7-16, 201:22-202:1. Inglish concedes that the mark's intrinsic value "didn't have anything to do with Spiraledge's goodwill as far as [Inglish] can see." *Id.* at 202:11-15.

Inglish expressed reservations about the notion that SeaWorld could be ordered to account for profits attributable to the intrinsic value of "aquatica":

> Now, the question I have with the intrinsic value is to whether or not the courts are going to accept that as a form of damages because, as we all talked about earlier today, there is some case law that suggests that when you're looking at unjust enrichment, you're focusing on the taking of goodwill. There are some cases that suggest that. And if that is the legal requirement, I would have no opinions at this point regarding unjust enrichment.

*Id.* at 199:20-200:1.

Inglish's reservations are well-founded. *Maier*, *Lindy Pen*, and *Adray* <u>are</u> the law in the Ninth Circuit. Those cases do not permit disgorgement based simply on the fact that the infringer benefitted from the "intrinsic value" of a mark. The law is clear that disgorgement of SeaWorld's profits is permissible only if it could be found to have intentionally capitalized on the goodwill of Spiraledge's AQUATICA

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY ADJUDICATION OF DAMAGES

1  mark.  Only then does disgorgement serve the purpose of compensating the plaintiff

2  for its harm, rather than punishing the defendant unnecessarily.  Inglish correctly

3  admits that SeaWorld cannot be accused of such willfulness, and that Spiraledge's

4  disgorgement fails as a matter of law under binding Ninth Circuit authority.

5        **D.    "Willfulness" Is Not Redefined For Reverse Confusion Cases**

6        In deposition, Inglish previewed Spiraledge's argument in opposition to this

7  motion.  Spiraledge will argue that an exception should be made to *Maier*, *Lindy*

8  *Pen*, and *Adray* because this is a "reverse confusion" case.  Specifically, Spiraledge

9  will argue that the defendant in a reverse confusion case is typically larger and more

10 successful than the plaintiff and therefore less likely to have selected a mark to

11 capitalize on the plaintiff's goodwill, and as such a different standard of willfulness

12 should apply.

13       As a preliminary matter, recognizing a "reverse confusion" exception to the

14 *Lindy Pen* standard would be unworkable.  Reverse confusion simply means that

15 consumers believe the senior user's products originate from the junior user and not

16 the other way around.  *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630

17 (9th Cir. 2005) ("reverse confusion occurs when consumers dealing with the senior

18 mark holder believe that they are doing business with the junior one.")  That can be

19 alleged in <u>every</u> case, and thus a exception to the *Lindy Pen* standard for reverse

20 confusion cases would be an exception that swallows the rule.

21       Regardless, the Ninth Circuit has never recognized an exception to *Lindy Pen*,

22 *Maier*, and *Adray* for reverse confusion claims.  Far from it, *Lindy Pen* <u>is</u> a reverse

23 confusion case!  There, the defendant, Bic, had a "major position in the pen

24 industry" in comparison to the plaintiff, Lindy, whose name was "relatively

25 obscure."  *Lindy Pen*, 982 F.2d at 1406.  The fact that Bic was larger and more

26 successful, and was therefore unlikely to try to trade off Lindy's goodwill, <u>was the</u>

27 <u>exact reason</u> that the Court found that disgorgement would constitute a penalty

28 rather than compensation and was unavailable.  The *Lindy Pen* Court clearly did not

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY ADJUDICATION OF DAMAGES

1  believe that a different standard ought to apply in the reverse confusion context or

2  else it would never have reached the result that it did.

3       A recent decision from the Honorable Audrey B. Collins, then Chief Judge of

4  the District Court for the Central District of California, discusses why the *Lindy Pen*

5  Court found it appropriate to require an intent to trade off goodwill in the reverse

6  confusion context.  In *Spin Master, Ltd. v. Zobmondo Entertainment, LLC*, 944

7  F.Supp.2d 830, the plaintiffs asserted claims against the defendants for infringement

8  of their registered trademark WOULD YOU RATHER . . . ?  Although the plaintiffs

9  had priority by virtue of an ITU application, their sales under the mark were only

10 modestly successful by comparison to the millions of dollars in revenues earned by

11 the defendant on its competing products.  *Id.* at 835.

12      The defendants in *Spin Master* moved for summary adjudication of the

13 plaintiffs' claims to disgorge profits on an unjust enrichment theory.  In opposing

14 the motion, the plaintiffs "dispute[d] that *Lindy Pen* required proof that the infringer

15 intended to trade off the established name of another to show willfulness."  *Id.* at

16 847.  The plaintiffs argued that "a broader standard can apply based on 'deliberate,'

17 'false,' 'misleading,' or 'fraudulent' conduct."  *Id.*  They argued that the

18 "willfulness standard may be different in cases of reverse confusion because an

19 infringer's intent to trade off the established goodwill of the smaller, less established

20 plaintiff is necessarily absent."  *See id.* at 848.

21      The District Court disagreed, holding that the plaintiffs' interpretation of the

22 willfulness standard "cannot be squared with the language of *Lindy Pen*, which

23 required some showing of intent to trade off the mark holder's 'established name' as

24 a necessary (but perhaps not sufficient) condition to justify a disgorgement remedy."

25 *Id.*  The Court explained that *Lindy Pen* "twice set forth a rule that expressly limited

26 disgorgement 'only' to cases involving attempts to 'exploit the advantage of an

27 established mark' and 'gain the value of an established name of another,'" and

28 further that *Lindy Pen* "applied that rule to find that disgorgement would have

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY ADJUDICATION OF DAMAGES

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  amounted to a penalty and not compensation because the defendant with a 'major

2  position in the pen industry' was not trading off the plaintiff's 'relatively obscure

3  name.'" *Id.*  The Court disagreed that "other evidence of intentional infringement"

4  would suffice to justify disgorgement, *id.*, reiterating *Lindy Pen's* point that

5  "[d]isgorging the infringer's significant profits without proof of trading off the mark

6  holder's goodwill would still amount to a penalty to the infringer and a windfall to

7  the trademark holder, who has only a 'relatively obscure name' to appropriate, even

8  if the infringer's conduct was otherwise intentional." *Id.* at 848-849.  Finding no

9  evidence that the defendants "adopted the mark intending to trade on Plaintiffs'

10  established name," the Court granted summary adjudication on the claim.  *Id.*[4]

11       The Court's reasoning in *Spin Master* is compelling.  Where an infringer

12  adopts a mark to "gain the value of an established name of another," an inference

13  can be drawn that the infringer's profits are attributable in some part to the

14  trademark holder's goodwill.  Disgorging those profits then serves the Lanham

15  Act's purpose of compensating the trademark holder for harm that it suffered. *See*

16  15 U.S.C. § 1117(a).  Conversely, it does not follow that an accused infringer

17  profited from the plaintiff's goodwill merely because it was aware of the plaintiff's

18  trademark.  Nor can it be inferred from the infringer's knowledge of the plaintiff

19  that it profited at the plaintiff's expense, or that the amount of profits corresponds to

20  the extent of the plaintiff's harm.  As a result, disgorging an infringer's profits solely

21  on the basis that it knew of the plaintiff's trademark rights is punishment, nothing

22  more.  And particularly in a reverse confusion like this one, where ██████████

23  ██████████████████████████████████████████████, disgorgement is

24  certain to grant the plaintiff a windfall.  *See Lindy Pen*, 982 F.2d at 1405 ("When

25  awarding profits, the court is cautioned that the 'Plaintiff is not . . . entitled to a

26  windfall.'"); *see also Trovan, Ltd. v. Pfizer, Inc.*, 2000 WL 709149 *14 (C.D. Cal.

27  ───────────────

28       [4] *Spin Master* allowed the plaintiff to proceed to trial on a "proxy" theory of disgorgement, which is not asserted in this case for the reasons discussed above.

Kinsella Weitzman Iser Kump & Aldisert LLP
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY ADJUDICATION OF DAMAGES

1   May 24, 2000) (reducing jury award on the basis that trademark damages should not

2   "exceed the value of . . . plaintiffs' mark and its underlying goodwill").

3         In sum, allegations of "reverse confusion" are not a magic wand that

4   Spiraledge can wave to circumvent *Maier*, *Lindy Pen*, and *Adray*.  These cases make

5   no distinction between forward confusion and reverse confusion theories, and they

6   preclude Inglish's disgorgement claim for the reasons described above.

7         **E.**      **Disgorgement Would Provide Spiraledge An Improper Windfall**

8         Inglish's unjust enrichment theory fails for the additional and independent

9   reason that disgorgement of SeaWorld's profits under the circumstances of this case

10   would clearly constitute punishment and not compensation and would provide

11   Spiraledge with a windfall.

12         Spiraledge is targeting <u>all</u> of SeaWorld's revenues for disgorgement, ████████

13   ████████████████████ (and growing), and it asks this Court to disgorge

14   SeaWorld's profits on those revenues unless SeaWorld proves that a lesser amount

15   is appropriate.  Although Spiraledge will readily admit that it does not expect to

16   recover ████████, undoubtedly its intention is to demand millions at trial.  Indeed,

17   even before SeaWorld opened its first Aquatica waterpark in March 2008, before

18   Spiraledge launched aquatica.com in September 2008, and before Spiraledge

19   obtained a trademark registration in December 2011, the company's founder and

20   principal, Avi Benaroya, ████████████████████

21   ████████████████

22     ████████████████████

23     ████████████████████

24     ████████████████████

25     ████████

26   Exh. 13.

27         Whether it is ████████ or some lesser amount of profits that Spiraledge

28   demands, disgorgement of SeaWorld's profits would not serve the purpose of

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   compensating Spiraledge for any harm that the alleged trademark infringement has

2   caused it.  Inglish's theory, as discussed above, is that SeaWorld is capitalizing on

3   the intrinsic value of the word "aquatica"—the inherent qualities that make it an

4   appealing name for a waterpark.  Even if true, it does not follow that when

5   SeaWorld benefits from the intrinsic value of "aquatica," Spiraledge is harmed.  Nor

6   can the inference be drawn that the extent to which SeaWorld's profits are

7   attributable to the intrinsic value of "aquatica" correspond to the amount of harm

8   Spiraledge has suffered.  Disgorging SeaWorld's profits attributable to the intrinsic

9   value of "aquatica," therefore, does not aim to compensate Spiraledge for whatever

10  harm the alleged infringement caused it.

11      Moreover, the "intrinsic value" in the "Aquatica" name is largely due to its

12  descriptiveness.  SeaWorld's separate motion for summary judgment demonstrates

13  that "aquatica" is highly descriptive of the parties' products and services.

14  SeaWorld's focus groups found "Aquatica" an appealing name for a waterpark in

15  part because of its descriptiveness, stating ████████████████████████████

16  ████████████████████████████  *See supra* p. 4-5.  Given that descriptive

17  words are not protectable as trademarks, no profits should be disgorged if they are

18  merely attributable to the fact that "Aquatica" describes SeaWorld's parks.

19      Last but certainly not least, an award of profits would provide Spiraledge a

20  windfall because of the overwhelming evidence that the company's own failings are

21  responsible for the slow sales and slow growth of the Aquatica brand that it

22  complains of in this case.  Spiraledge founder, Avi Benaroya, testified ████████

23  ████████████████████████████████████████

24  ██████████████████████████████  Exh. 8 (Benaroya Depo. at 67:15-

25  69:12).  ████████████████████████████████████████

26  ████████████████████████████████████

27  ████████████████████████████████████████████

28  ██████████████████  Aaron Skiles, the former COO of

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY ADJUDICATION OF DAMAGES



1  Spiraledge, Jason Chen, the former vice president of product development, and

2  Michelle Mughannam, who spearheaded the launch of the Aquatica brand, ███████

3  ████████████████████████████████████████████████████████████████████████ .

4  Exh. 2 (Skiles Depo. at 225:22-226:3); Exh. 3 (Chen Depo. at 204:25-205:3); Exh. 4

5  (Mughannam Depo. at 109:18-24).

6          These and other employees of Spiraledge testified ███████████████████

7  ████████████████████████████████████████ .  Michelle Mughannam

8  was responsible for marketing and selling the Aquatic line from April 2009 to May

9  2010.  Exh. 4 (Mughannam Depo. at 10:11-23)  According to Mughannam, ████████

10  ████████████████████████████████████████████ . *Id.* at

11  33:5-35:8, 134:10-135:10.  Mughannam observed that █████████████████████████

12  ████████████████████████████████████████████████████████████

13  █████████████████     *Id.* at 138:21-140:4.  Asked if the Aquatica line could have

14  succeeded, she answered: █████████████████████████     *Id.* at

15  43:8-12.

16          Worse, for more than three years after Mughannam left, ██████████████

17  ████████████████████████████████████████████████████  Exh.

18  6 (Aguirre Depo. at 48:23-49:3).  ████████████████████████████████████

19  ████████████████████████████████████████████████████████

20  ████████ ██████ ██████████████████████████████████████

21  █████████████████████████████████  Exh. 5 (Guisado Depo. at

22  113:9-23).  Chen testified, as should go without saying, █████████████████████

23  ████████████████████████████████████████████████████████████████████

24  ████████████████     Exh. 3 (Chen Depo. at 35:16-36:22).

25          Several executives believed █████████████████████████████████████

26  ████████████████████████████████████████████████████████████████

27          ⁵ "Team division" is a reference to Spiraledge's sales of swimwear to high

28  school, college, and club swim teams.

Kinsella Weitzman Iser Kump & Aldisert LLP
808 Wilshire Boulevard, 3ʳᵈ Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY ADJUDICATION OF DAMAGES



1 ████████████████████████████████████████████

2 ██████████████████████████████████████████████

3 ███████████████████████████████████████

4 █████████████████████████████████████████

5 ███████████████████████████

6 ▐██████████████████████████████████████

7 █████████████████████████████████████

8 ██████████████████████████████████████

9 ███████████████████████████████████████

10 ████████████████████████████████████████

11 ████████████████████████████████████████

12 ██████████████████████████████████████

13 ████████████████████████████████████████

14 ███████████████████████████████████████████

15 ██████████████████████████████████████████

16 ███████████████████████████████████

17 ███████████████████████████████████████████

18 ██████████████████████████████████████

19      Given the many ways that Spiraledge ████████████████, a

20 disgorgement of profits would not compensate Spiraledge for the harm ███

21 ███████████████████████████  It would reward Spiraledge for its

22 lack of commitment to its Aquatica product line.  The notion that Spiraledge would

23 recover millions of dollars to repair the value of brand which is worth a fraction of

24 that amount is, as Professor McCarthy describes, untenable and inconsistent with the

25 Lanham Act:

26      There is something basically unseemly and grossly uneconomical in an

27      award to a small company of an amount of money several times its net

28      worth to use to resuscitate an infringed trademark.  When such an

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  award is many times the value of the trademark property, then it

2  appears that plaintiff has received a windfall, not compensation.

3  J. Thomas McCarthy, 5 *McCarthy on Trademark* § 30:84 (5th ed. 1999).

4  For all of the above reasons, Spiraledge's disgorgement claim contravenes

5  *Lindy Pen* and other binding Ninth Circuit cases, and it seeks an accounting of

6  profits that would be provide it a windfall in violation of Section 1117 of the

7  Lanham Act.  The claim should be summarily adjudicated in SeaWorld's favor.

8  **IV.    SPIRALEDGE'S CORRECTIVE ADVERTISING CLAIM FAILS AS A**

9  **MATTER OF LAW**

10  Via its "search engine optimization" expert, Matthew Storms, Spiraledge

11  asserts a claim for purported "corrective advertising" costs.  Storms ▮▮▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Exh. 31 at 13.  Although

16  corrective advertising is at times a viable remedy, it clearly is not here.

17  "A corrective advertising award is intended to restore the value of plaintiff's

18  trademark."  *S. Cone, Inc. v. Timex Corp.*, 2002 WL 34450329 *1 (S.D. Cal., 2002).

19  Accordingly, corrective advertising awards are permissible "only to the extent that

20  the amount of money needed for corrective advertising does not exceed the damage

21  to the value of [the] mark."  *Adray*, 76 F.3d at 989.  In *Timex*, the Southern District

22  of California excluded plaintiff's expert's opinion regarding corrective advertising

23  damages where the opinion did not include an analysis of loss in value to plaintiff's

24  mark and constituted "impermissible speculation."  *Timex*, 2002 WL 34450329 at

25  *1.  Similarly, in *Quia Corp. v. Mattel, Inc.*, 2011 WL 2749576 at *5 (N.D. Cal.

26  2011), the court denied a corrective advertising award on the basis that the plaintiff

27  failed to "present non-speculative evidence that goodwill and reputation—that is,

28  the value of its mark—was damaged in some way."

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

Here, as in *Timex* and *Quia*, Storms failed to conduct any analysis of purported lost value to Spiraledge's AQUATICA mark as the law requires. Instead of analyzing loss in value to the AQUATICA mark, Storms theorizes ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███. Exh. 11 (Storms Depo. at p. 46:15-47:19; 89:1-5; 96:8-12). Storms then calculates ████████████████████████████████████████

████████████████████████████████████████████████

█████████████, is <u>not</u> an estimate of the loss in value of the AQUATICA mark. In other words, it is <u>not</u> a calculation of corrective advertising costs.

████████████████████████████████████████████████ In *S. Snow Mfg. Co. v. Sno Wizard Holdings, Inc.*, 829 F. Supp. 2d 431, 436 (E.D. La. 2011), the plaintiff held trademarks for SOUTHERN SNOW and FLAVOR SNOW. Plaintiffs complained that the defendant's use of these trademarks in metatags on its website caused its site to rank first and to divert traffic from plaintiff when a user searched "southern snow flavor snow." The court disagreed, holding: "The fact that [defendant's] website appears in the search list for 'southern snow flavor snow' ahead of plaintiffs' listing does not necessarily suggest an association or connection between the companies or their products, or that any prospective buyers would be likely to confuse the two companies." *Id.*

Likewise, the Central District of California held in *Quia* that a "claim that every click-through to a site related to defendants' product results in measurable or otherwise compensable harm to plaintiff is based entirely on conjecture." 2011 WL 2749576 *5. The Court noted that there was "no evidence that such clicks result from a diversion from plaintiff's site, much less that such diversion resulted from initial interest confusion and cannot be remedied immediately by the consumer." *Id.*

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY ADJUDICATION OF DAMAGES

The court added that "even if web traffic has been diverted from its site, plaintiff has not shown that any underlying confusion has damaged its goodwill." *Id.*; *see also Bihari v. Gross*, 119 F. Supp. 2d 309, 320 (S.D.N.Y. 2000) (noting that "resuming one's search for the correct website is relatively simple. With one click of the mouse and a few seconds delay, a viewer can return to the search engine's results and resume searching for the original website."); *Toyota Motor Sales v. Tabari*, 610 F.3d 1171, 1179 (9th Cir.2010) ("internet consumers are accustomed to such exploration by trial and error. They skip from site to site, ready to hit the back button whenever they're not satisfied with a site's contents. They fully expect to find some sites that aren't what they imagine based on a glance at the domain name or search engine summary.")

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ Storms's deposition testimony also contradicts his theory.  When testifying about third party "Aquatica" websites which also show up in Google searches of that word—for example, Aquatica Digital (aquatica.ca), Aquatica Pond Supplies (aquaticaponds.com), and an Aquatica Aquarium store (aquaticatinleypark.net)—Storms agreed that users of search engines are savvy enough not to be confused between those sites and Spiraledge's aquatica.com website.  Storms testified that it "would be very easy to discern" between these third-party websites and Spiraledge's site because consumers would see distinguishing information such as "digital camera housings", "pond supplies," and the geographic location of these business.  Exh. 11 (Storms Depo. at 283:11-286:15).  Yet, when asked about the distinguishing information listed in search results relating to SeaWorld's website, such as "SeaWorld," "waterpark," "Orlando," and "San Antonio," Storms contradicts himself and opines that this information would actually <u>cause</u> consumers to confuse Spiraledge with SeaWorld.

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1    *Id.* Storms is talking out of both sides of his mouth.[6]

2    Storms further admits that the assumptions on which he basis his theory of

3    diverted traffic are exaggerated and flawed, and that the harm he is theorizing is

4    speculative. In deposition, Storms admitted that it is <u>not true</u> that computer users

5    only click the first result in a Google search. Internet users <u>do</u> pay attention to the

6    information in the results and do not necessarily blindly click the first result. Exh.

7    11 (Storms Depo. at 67:21-68:23; 72:21-73:1). Consumers <u>will</u> scroll past the first

8    few results, and in fact, analytics data shows that consumers have done exactly that

9    to find Spiraledge's website. *Id.* at 56:14-57:10; 115:15-118:1; 152:22-154:1.

10   ████████████████████████████████████████████████

11   ████████████████████████████████████████  He testified

12   (1) that he could not quantify the amount of lost traffic to aquatica.com (*id.*, pp.

13   48:7-10); (2) that when users search "aquatica" looking for Spiraledge's website and

14   do not find it immediately, they are not likely to give up and are instead likely to

15   redefine their search to include additional terms like "swimwear" or enter

16   aquatica.com directly into their browser (*id.* at 45:3-46:2; 48:11-49:11; 51:24-52:9;

17   52:23-54:14; 112:16-113:9); and (3) that he has seen no evidence that a consumer

18   looking for Spiraldege's website was unable to find it (*id.* at 50:8-18). Further, with

19   respect to those computer users who search for "aquatica" and click on SeaWorld's

20   site, Storms agrees that there is no reason to believe those people were not in fact

21   looking for SeaWorld's site in the first place. *Id.* at 104:14-15:23; *see also S. Snow*,

22   829 F.Supp.2d at 436 (holding that "one cannot make assumptions about the

23   searcher's objectives when he types 'southern snow flavor snow' or some part or

24   combination of that phrase into an internet search engine. The user is not necessarily

25   trying to locate plaintiffs' website because other vendors like [defendant] service

26   ───────────────────

6 ████████████████████████████████

27   ████████████████████████████████████████████████

28   ████████████████████████████████████████████████

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY ADJUDICATION OF DAMAGES

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1    their machines.").

2        Storms's analysis has yet another fatal flaw: he admits that if SeaWorld were

3    found liable and the Court determined that an injunction was appropriate, then

4    SeaWorld's new website would not be using the AQUATICA mark and would not

5    rank for searches for the term "aquatica." Exh. 11, (Storms Depo. at 158:22-159:3;

6    188:15-189:19). Obviously, no costs would need to be incurred under those

7    circumstances to outrank SeaWorld in searches for "aquatica." Conversely, if the

8    Court finds that SeaWorld should not be enjoined from using the mark in connection

9    with its waterparks, Spiraledge is not entitled to a subsidy from SeaWorld to

10   improve the search engine ranking for aquatica.com.

11       Upon realizing that this admission destroys his damages theory, Storms

12   quickly concocted a new theory that even if SeaWorld no longer appeared in search

13   results for "aquatica," Spiraledge would still have to spend the ████████████

14   ████████ to overtake websites such as Yelp or YouTube for the first position in search

15   rankings, because those sites may still have reviews or videos relating to

16   SeaWorld's former Aquatica waterpark. *Id.* at 173:18-174:21; 175:10-176:6;

17   188:15-189:19. That opinion is again pure speculation. Storms concedes that

18   "nobody can quantify" who would be first in the search engine results if SeaWorld

19   completely stopped using the AQUATICA mark, and that he "would have to guess."

20   *Id.* at 181:10-182:3. Regardless, Storms agrees that even if websites such as Yelp

21   and YouTube ranked above or near aquatica.com, consumers would not be confused

22   and Spiraledge would thus suffer no harm. *Id.* at 203:8-204:6; 207:9-209:24.

23       In sum, because Storms fails to analyze the loss in value to the AQUATICA

24   mark and offers only speculation to support Spiraledge's trademark and goodwill

25   were damaged by its placement in search engine results, Spirlaedge's corrective

26   advertising claim fails as a matter of law.

27

28

**V.    <u>CONCLUSION</u>**

For the reasons discussed above, SeaWorld respectfully requests that the Court grant summary adjudication in its favor of all claims by Spiraledge for monetary relief.

DATED: June 9, 2014

KINSELLA WEITZMAN ISER
KUMP & ALDISERT LLP

By:    /s/ Lawrence Y. Iser
Lawrence Y. Iser
Attorneys for  SeaWorld Entertainment, Inc.;  SeaWorld Parks & Entertainment, Inc.;  SeaWorld Parks & Entertainment LLC  and SeaWorld LLC

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850